United States District Court
Northern District of California

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **CHRISTIAN STARK** *et al.*, | Case No.: **12-CV-4385 YGR** |
| **Plaintiffs,** | **ORDER ON MOTION FOR PRELIMINARY INJUNCTION** |
| **vs.** | |
| **DIAGEO CHATEAU & ESTATE WINES CO.,** | |
| **Defendant.** | |

Plaintiffs Christian Stark, Stark Wine LLC ("Stark Wine"), and Stay @ Home Sommelier, LLC ("S@HS") (collectively "Plaintiffs") bring this trademark infringement action against Defendant Diageo Chateau & Estate Wines Company ("Diageo"), alleging that the mark for Defendant's "Stark Raving™" wine is confusingly similar to Plaintiffs' "Stark Wine®" and "Stark Thirst™" marks. Plaintiffs bring seven trademark claims: (1) Federal Trademark Infringement under 15 U.S.C. § 1114; (2) Cancellation of Trademark Registration under 15 U.S.C. § 1119; (3) Federal Unfair Competition under 15 U.S.C. § 1125(a); (4) Trademark Infringement under Cal. Bus. & Prof. Code § 14335; (5) Unfair Competition under Cal. Bus. & Prof. Code §§ 17200 *et seq*.; (6) False or Misleading Statements under Cal. Bus. & Prof. Code §§ 17500 *et seq*.; and (7) Common Law Trademark Infringement.

Plaintiffs have moved for a preliminary injunction to stop the advertisement, promotion, distribution and sale of Defendant's "Stark Raving™" wine on the grounds that consumers will likely and mistakenly associate Diageo's "Stark Raving™" wine with Plaintiffs' wines, which will irreparably harm the Plaintiffs' businesses.  The parties submitted briefs, the Court held a two-day hearing with live testimony, at the end of which counsel presented oral argument.

Having reviewed the parties' briefs, the admissible evidence offered into the record, including during the hearing, the argument of counsel following the close of evidence, and having compared the marks themselves and the context of their use in the marketplace, the Court hereby **GRANTS** the Motion for Preliminary Injunction only as to Sonoma County, otherwise the Motion is **DENIED**.

## I.     BACKGROUND

### A.     STARK WINE

Plaintiff Christian Stark is a winemaker located in Sonoma County, California.  He started his business in 2003, and sold his first wines, a 2003 vintage, in 2005.  Since that time he has grown the business, and now produces eight varietals, which he sells in certain parts of the United States.[1]  His passion is the Rhône varietals, Syrah and Viognier.  Christian Stark testified that he had earned a reputation in the industry for producing and selling ultra-premium handcrafted wines.  His mission was, and still is, quality over quantity.  He sells his wine with the slogan "deliciously down-to-earth."

Mr. Stark testified about his involvement in the winemaking process over which he maintains full control.  He starts by selecting grapes grown by reputable farmers with proven track records for growing exceptional quality fruit.  He is responsible for fruit sourcing, grower relations and wine production.  The reputational evidence in the record for Stark Wine® focused on the winemaker himself, Christian Stark,[2] and the labels on his wine simply state "STARK" as shown below:

---

[1] Plaintiffs' Motion lists fifteen states:  California, New York, Florida, New Jersey, Connecticut, Montana, New Mexico, Maine, Rhode Island, Oregon, Colorado, Virginia, Georgia, Ohio, Minnesota, and Washington, D.C.  On the advice of counsel, Plaintiff would not confirm, at deposition or at the hearing, whether he is licensed to lawfully sell his product in any of these states or the District of Columbia.

[2] *See* Plaintiffs' Exhibits 1, 8, 17, 18, and 23.  Plaintiffs' correspondence to customers connect the winemaker "Stark" to the wine.  (Exs. 10, 11, 14, and 15.)



Def. Opp'n, Dkt. No. 37, at 1; Dkt. No. 3, Ex. C at 18.

Christian Stark sells Stark Wine® primarily direct-to-consumer in *Garagiste*, a tasting room co-owned by Stark Wine LLC and located in Healdsburg, Sonoma County, California.  He also sells his wine online via starkwine.com,[3] through wholesale accounts with California restaurants, wine bars and retail shops, and through the Stark Wine Club.  Stark Wine® ranges in price from $28 to $44 per bottle, with an average price point of $36.  Output of Stark Wine® has increased from 150 cases in 2003 to 850 cases in 2011.  Christian Stark expects to produce 1000 cases of Stark Wine® in 2012.

Christian Stark individually owns the "Stark Wine®" trademark, registered in International Category 33 with a description of "Wine" with the United States Patent and Trademark Office ("PTO") since October 17, 2006, Registration No. 3,160,031.  The "Stark Wine®" mark achieved "incontestability" status on or about June 2, 2012.

**B.   STAY @ HOME SOMMELIER[4] AND STARK THIRST™**

In April 2012, Stark Wine LLC and S@HS launched a *new* sub-brand of wine called "Stark Thirst™."  Based in New York City, Kersten Krall Walz ("Krall Walz") is the founder, marketing

---

[3] Plaintiffs' moving papers and the accompanying declaration of Christian Stark stated that Stark Wine® was sold through a number of third party websites.  The evidence produced during the hearing contradicted this assertion, as none of the third-parties identified sell Stark Wine®.  Subsequent to the filing of his declaration and motion, Plaintiffs arranged for the website www.lot18.com to sell Stark Wine®.

[4] A "sommelier" is a wine steward, the person in charge of the wines in a club or restaurant.  *See* Merriam-Webster's Ninth New Collegiate Dictionary, p. 1124 (1988).

United States District Court
Northern District of California

United States District Court
Northern District of California

director, and co-owner of S@HS.  (Krall Walz Dec. ¶ 1.)  A self-described Madison Avenue refugee, Ms. Krall Walz worked in New York City's advertising industry for fourteen years, rising from administration to account director.  (*Id.* ¶ 3.)  Ms. Krall Walz worked at two of "Madison Avenue's" flagship agencies:  Young & Rubicon and Saatchi & Saatchi.  (*Id.* ¶ 3.)

In 2010, Krall Walz left the advertising industry to start a business that would allow her to "stay at home" to raise her son and to pursue her passion for wine.  Prior to leaving the advertising industry, she spent five years taking classes to obtain a diploma in Wine Studies from London's Wine & Spirit Education Trust, one of the world's most comprehensive and rigorous wine study programs.  (*Id.* ¶ 5.)  She met Christian Stark in the fall of 2010.  (*Id.* ¶ 7.)  Initially, she did brand consulting for Stark Wine, helping to develop its current strategic brand position and update the website.  (*Id.*)

In the summer of 2011, Krall Walz formed S@HS to merge her advertising experience with her knowledge and passion for wine.  At this point she had been working on several brand extensions for Stark Wine, *i.e.* using other words in combination with the word "stark" for purposes of selling wine.  Krall Walz conceived of this idea on her own.  Christian Stark never attempted brand extensions and did not assist in her work.  In the summer of 2011, Krall Walz and S@HS partnered with Christian Stark to create the Stark Thirst™ brand extension.

Ms. Krall Walz conducted market research, including holding focus groups to decide on a brand name and a brand identity using extensions on the word "stark."  Her target audience was Generation Y, defined in the alcohol industry as individuals in the 21-35 year range ("Gen Yers").  Her research revealed that (i) 24% of Gen Yers drink wine as their preferred alcoholic beverage, (ii) Gen Yers are looking for bottles priced under $15 and are socially conscious, and finally, (iii) the name "Stark Thirst" tested better than the other extensions.

Plaintiffs launched Stark Thirst™ as a more affordable brand, marketed towards these younger wine drinkers.  It retails for approximately $16 per bottle, with 10% of profits donated to WaterAid, an international charitable organization that brings safe drinking water to those in need.  The mission for Stark Thirst™ is to give people a charitable way to drink delicious wine.  Plaintiffs have produced 216 cases of Stark Thirst™.

On October 19, 2011, S@HS applied to the PTO to trademark "Stark Thirst™."  In February 2012, the PTO denied the "Stark Thirst™" on the basis that the dominant feature of both the "Stark Wine®" and "Stark Thirst™" marks is the word "Stark," which the PTO stated is identical in sight, sound, and meaning.  Subsequently, Christian Stark filed a consent agreement with the PTO noting that Stark Wine LLC and S@HS are business partners that sell wines under both the Stark Wine® and Stark Thirst™ marks.[5]  On June 20, 2012, PTO found that the "Stark Thirst™" appeared to be entitled to registration and approved the mark for publication.  The trademark registration for Stark Thirst™ is pending with the PTO.

## C.   DEFENDANT DIAGEO CHATEAU & ESTATE WINES COMPANY

Diageo is a subsidiary of an international beverage conglomerate that owns such recognized brands as Smirnoff Vodka, Jose Cuervo Tequila, Guinness Beer, Tanqueray Gin, Johnnie Walker Scotch, Captain Morgan Rum, Veuve Cliquot Champagne and Dom Perignon.  Diageo Chateau & Estate Wines Company focuses exclusively on wines.  Its brands include Acacia Vineyard, Beaulieu Vineyard, Chalone Vineyard, Provenance Vineyards, Sterling Vineyards, and Rosenblum Cellars.  Stark Raving™ is a sub-brand of Rosenblum Cellars.

In November 2011, Diageo began plans for sub-brands of wine to target the millennial consumer segment of the population, defined as ages 28-38.  This resulted in the "Stark Raving™," "Rose-N-Blum™" and "Butterfly Kisses™" sub-brands.  Diageo wanted to create a wine that goes against the grain and celebrates the idea of doing things differently and with great passion.  The concept for "Stark Raving™" was to bring to life the personality of Rosenblum Cellars' founder, Kent Rosenblum, who left a successful career as a veterinarian to pursue his passion for winemaking.  (*See* Declaration of Mary Frances Light Dusenbury ("Light Dec."), ¶ 11 ("Our founder quit his day job to make wine in his garage.  They said he was stark raving mad.  Mad?  We call it inspired!").)  The Stark Raving™ sub-brand revolves around a mad scientist persona and uses the tag line "Crazy Good Wine" as illustrated below:

---

[5]  Separately another applicant, not a party to this lawsuit, applied for the mark "Stark Naked" and was denied for the same reasons that "Stark Thirst™" initially was denied.

United States District Court
Northern District of California




Ex. 202                    Ex. 42

The wine attempts to appeal to male millennials by being fruitier and juicier than other wines, and it is packaged in a screw-top bottle with a label design modeled on craft beers.

On February 13, 2012, Diageo applied to the PTO for the trademark "Stark Raving™" in International Category 33 with a description of "Alcoholic beverages other than beer."  Plaintiffs allege that Diageo not only knew of the "Stark Wine®" trademark in the same International Category 33, but with a description of "Wine," but in fact, knew that the "Stark Thirst™" mark had been rejected days earlier for being too similar to the "Stark Wine®" mark.  Plaintiffs allege that Diageo intended to mislead the PTO by using the description "Alcoholic beverages other than beer" instead of "Wine," knowing that its application likely would be rejected if Stark Raving™ was described as "Wine."  The actual evidence produced at the hearing demonstrated that Diageo had filed over 80% of all of relevant applications in International Category 33 with the broader description "Alcoholic beverages other than beer."  The PTO approved Diageo's application on June 26, 2012.

In the summer of 2012, Diageo introduced Stark Raving™ wine.  Its suggested retail price is between $12.99 and $13.99, although approximately 75% of the wine is expected to be sold at the sale price of $10.99 primarily through mass market retailers such as Target.  Diageo has produced approximately 80,000 cases of Stark Raving™ wine.  Stark Raving™ wine began shipping in June 2012, and by the end of August 2012, Diageo had delivered 17,000 cases to distributors, of which 7,000 had been delivered to retailers.  As of August 15, 2012, Stark Raving™ wine was on the shelves at over 1,500 stores across the United States.  In October, Diageo started rolling out a Stark

1   Raving™ food truck program, which offers wine tastings of the Stark Raving™ sub-brand in

2   coordination with food truck rallies across the nation.  (Light Dec. ¶ 16.)

3         Plaintiffs requested Diageo to cease and desist from producing and selling wine under the

4   "Stark Raving™" brand.  Diageo refused and Stark brought this action to enjoin Diageo from

5   producing, promoting, distributing and selling the "Stark Raving™" wines to prevent loss of

6   goodwill and seek compensation for any damage already inflicted.[6]

7   **II.      LEGAL STANDARD**

8         A preliminary injunction is an extraordinary remedy, which should be granted only in limited

9   circumstances and where the merits of the case *clearly* favor one party over the other.  *Winter v.*

10  *Natural Resources Defense Council*, 555 U.S. 7, 24 (2008).

11        The Court considers four factors when deciding whether to issue a preliminary injunction:  (1)

12  whether the moving party has demonstrated that it is likely to succeed on the merits; (2) whether the

13  moving party will suffer irreparable injury if the relief is denied; (3) whether the balance of the

14  hardships favor the moving party; and (4) whether the public interest favors granting relief.  *See*

15  *Miller v. California Pacific Medical Ctr.*, 19 F.3d 449, 456 (9th Cir. 1994) (*en banc*).  In a trademark

16  case, a plaintiff is entitled to a preliminary injunction if it can demonstrate either:  (1) a combination

17  of "probable success on the merits" and "the possibility of irreparable injury"; or (2) the existence of

18  "serious questions going to the merits" and that "the balance of hardships tips sharply in his favor."

19  *Sardi's Restaurant Corp. v. Sardie*, 755 F.2d 719, 723 (9th Cir. 1985) (quoted in *Brookfield*

20  *Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1046 (9th Cir. 1999)).

21  This represents two points on the sliding scale in which the required degree of irreparable harm

22  increases as the probability of success decreases.  *See Oakland Tribune, Inc. v. Chronicle Publishing*

23  *Co.*, 762 F.2d 1374, 1376 (9th Cir. 1985).  The burden of showing a likelihood of success on the

24  merits is "placed on the party seeking to demonstrate entitlement to the extraordinary remedy of a

25  preliminary injunction at an early stage of the litigation, before the defendant has had the opportunity

26

27  ─────────────────────

28  [6] Plaintiffs initially moved for a nationwide injunction, but have since limited the requested injunction to five
    states:  California, Florida, Illinois, New York and Texas.

1   to undertake extensive discovery or develop its defenses." *Perfect 10, Inc. v. Amazon.com, Inc.*, 487

2   F.3d 701, 714 *opinion amended on reh'g*, 508 F.3d 1146 (9th Cir. 2007).

## III.    DISCUSSION

### A.    OVERVIEW OF TRADEMARK PROTECTION

The Lanham Act defines a trademark as "any word, name, symbol, or device, or any combination thereof used by a person … to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." 15 U.S.C. § 1127.  Thus, a trademark is anything that serves to indicate the source of one company's goods and to distinguish them from the goods of others.  It "is merely a convenient means for facilitating the protection of one's good-will in trade by placing a distinguishing mark or symbol—a commercial signature—upon the merchandise or the package in which it is sold."  *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 98 (1918).

The owner of a trademark has a limited property right to exclude others from using that mark. *New Kids on the Block v. New America Pub., Inc.*, 971 F.2d 302, 306 (9th Cir. 1992).  A person acquires the right by being the *first* to use it in the marketplace, or by using it before the alleged infringer.  *Unlike* a copyright or a patent for an invention, a trademark is a property right only in connection with its use by an existing business.  *See United Drug*, *supra*, 248 U.S. 90; Roger E. Meiners, *Patents, Copyrights, and Trademarks: Property or Monopoly?*, 13 HARV. J.L. & PUB. POL'Y 911, 930 (1990) ("It is property only in the sense that trade reputation or goodwill is a property right.").

Courts focus on protecting consumers in cases involving infringement of a trademark which is the reason for classifying it as a form of unfair competition.  *See* 15 U.S.C. § 1125(a)(1); *Mars Inc. v. Kabushiki-Kaisha Nippon Conlux*, 24 F.3d 1368, 1373 (Fed. Cir. 1994) ("The law of unfair competition generally protects consumers and competitors from deceptive or unethical conduct in commerce ….  Patent law, on the other hand, protects a patent owner from the unauthorized use by others of the patented invention, irrespective of whether deception or unfairness exists.").  "The law of unfair competition has its roots in the common-law tort of deceit:  its general concern is with protecting consumers from confusion as to source.  While that concern may result in the creation of

'quasi-property rights' in communicative symbols, the focus is on the protection of consumers, not the protection of producers as an incentive to product innovation." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 158 (1989).

The elements of a trademark infringement claim are:  (1) a valid, protectable ownership interest in a trademark; and (2) defendant's use of a mark similar to plaintiff's trademark in a manner that is likely to cause consumer confusion.  *See* 15 U.S.C. § 1114(1).[7]  Likelihood of confusion is the central inquiry in the trademark infringement analysis:  whether a "reasonably prudent customer in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks" because of the similarities between the two marks.  *Dreamwerks Prod. Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998). "[B]ecause we are at the preliminary injunction stage, [Plaintiffs] must establish that it is likely to be able to show such a likelihood of confusion." *See Brookfield*, *supra*, 174 F.3d at 1052 n.15 (citing *Sardi's Restaurant*, *supra*, 755 F.2d at 723).  At this time the Court is not making ultimate findings of fact after a full trial on the merits.  The discussion of infringement, and factual findings in that regard, is directed only towards Plaintiffs' likelihood of success on the merits.[8]

_____

[7] Section 43(a)(1) of the Lanham Act itself provides that:

> Any person who, on or in connection with any goods or services, … uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, … shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).

[8] Plaintiffs' state law and common law trademark infringement claims and claim under California's Unfair Competition Law based on infringement are subject to the same legal standards as their Lanham Act trademark claim. *See Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1221 (9th Cir. 2012) (citing *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 632 (9th Cir. 2008).  Therefore, the same findings that the Court makes with respect to Plaintiffs' entitlement to a preliminary injunction with respect to the federal trademark claim, also apply to Plaintiffs' related state trademark infringement and unfair competition claims.

United States District Court
Northern District of California

**B.    FIRST ELEMENT:  VALID, PROTECTABLE OWNERSHIP INTERESTS IN THE TRADEMARKS AT ISSUE**

Rights in a trademark are obtained only through commercial use of the mark.  One way to establish trademark rights is through use of a trademark in commerce and federal registration under the Lanham Act.

Registration constitutes prima facie evidence of the validity of the registered mark and of a plaintiff's exclusive right to use that mark.  15 U.S.C. § 1115(a).  To acquire ownership of a trademark under the Lanham Act it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services, and, therefore, a party pursuing a trademark claim must meet a threshold "use in commerce" requirement.  *Id.* § 1051 *et seq.*

Once a registered trademark has been in use for five years and if certain statutory formalities are met (*e.g.*, timely filed affidavit of continuous use), the registration is considered "incontestable" evidence of the registrant's right to use the mark.  *See id.* § 1065.  Incontestable status provides that the "validity and legal protectability, as well as [the registrant's] ownership therein, are all conclusively presumed."  *Brookfield*, *supra*, 174 F.3d at 1046-47 n.10; 15 U.S.C. § 1115(b).[9]  A registrant may rely upon the incontestability of the mark in an infringement action.  *See Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 204 (1985).

1.    *Stark Wine*®

Since the "Stark Wine®" mark is incontestable, it is immune from challenge on certain grounds.  15 U.S.C. § 1065; *see* Barentzen Dec., Ex. D at 1 (PTO's notice of acceptance of declaration of incontestable status).  Diageo challenges the "Stark Wine®" mark on the grounds that it was never used in commerce, and therefore, has been abandoned.

A mark is "used in commerce" when (1) "it is placed in any manner on the goods or their containers or the displays associated therewith," and (2) "the goods are sold or transported in commerce."  15 U.S.C. § 1127.

---

[9] "Incontestable trademark" is a legal term of art which provides the owner with certain presumptions.   It does not mean that a challenge can never exist.  For example, contests are appropriate where the trademark has been abandoned, is being used to misrepresent the source of goods, or was obtained fraudulently.  *See Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 195 (1985).

United States District Court
Northern District of California

1    Diageo points out that the wines are labeled "STARK," not "Stark Wine®," and that the

2    phrase "Stark Wine®" only appears in fine print to identify the company's business name (this is both

3    on the front and back labels of the wine bottles).  On that basis, Diageo challenges the use of the

4    "Stark Wine®" mark, arguing that Plaintiffs only use the phrase "Stark Wine®" as a trade name and

5    not a trademark.[10]  At the hearing Plaintiffs introduced evidence of Stark Wine's use of the trademark

6    "Stark Wine®" on packaging and correspondence.  (*See* Exs. 2-7, 9-10, 12-13, 16, and 18.)

7    For purposes of a preliminary injunction, Stark Wine is "likely" to be able to show that it has

8    a protectable ownership interest in the registered trademark "Stark Wine®" based upon the

9    trademark's incontestable status and evidence that it has used the mark in commerce.

10   2.    *Stark Thirst*™

11   Diageo challenges the validity of S@HS's right to use the trademark "Stark Thirst™"

12   because the "Stark Thirst™" mark is not registered.  Here, S@HS asserts common law trademark

13   rights in "Stark Thirst™" through its use of the mark in New York City, and in interstate commerce,

14   beginning on April 20, 2012.  On June 20, 2012, the PTO found that "Stark Thirst™" appeared to be

15   entitled to registration and approved the mark for publication.  The time to oppose registration has

16   expired.  S@HS contends that its federal trademark registration is imminent.

17   To succeed on an infringement claim, S@HS will have to show use and geographic scope of

18   that use.  "Stark Thirst™" is available for purchase at only three locations in New York City—a high

19   end wine store in Manhattan, and a wine bar and a restaurant in Brooklyn.  S@HS's use of the Stark

20   Thirst™ mark has priority over Diageo's "Stark Raving™" in this geographic area.

21   S@HS is likely to be able to show that it has common law trademark rights in "Stark

22   Thirst™" in a limited geographic area to satisfy the first element.

23

24

25

---

26   [10] A "trade name" is defined in the Lanham Act as "any name used by a person to identify his or her business."

27   15 U.S.C. § 1127.  In contrast to trademarks, which refer to words or symbols used to identify and distinguish
     particular goods, trade names refer to the words or symbols used to identify and distinguish businesses.  *See*

28   *SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*, 846 F. Supp. 2d 1063, 1073 n.6 (N.D. Cal. 2012), *appeal
     dismissed* (Apr. 18, 2012) (citing 15 U.S.C. § 1127).

United States District Court
Northern District of California

C.      SECOND ELEMENT:  LIKELIHOOD OF CONFUSION

To prevail on a claim for trademark infringement, Christian Stark, Stark Wine LLC, and S@HS must establish that Diageo is using a mark confusingly similar to their own marks.  *See AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348 (9th Cir. 1979) *abrogated by Mattel, Inc. v. Walking Mountain Productions*, 353 F.3d 792 (9th Cir. 2003).  The central issue in a trademark action is whether consumers "'are likely to assume that a product or service is associated with a source other than its actual source because of similarities between the two sources' marks or marketing techniques.'"  *Nutri/System, Inc. v. Con-Stan Indus., Inc.*, 809 F.2d 601, 604 (9th Cir. 1987) (quoting *Shakey's Inc. v. Covalt*, 704 F.2d 426, 431 (9th Cir. 1983)); *Official Airline Guides v. Goss*, 6 F.3d 1385, 1391 (9th Cir. 1993) (issue can be recast as whether "the similarity of the marks is likely to confuse customers about the source of the products.").

Courts in the Ninth Circuit use the eight *Sleekcraft* factors to guide the likelihood of confusion analysis:  (1) the similarity of the marks; (2) the relatedness of the companies' goods; (3) the marketing channels used; (4) the strength of mark(s) of the junior holder or senior holder or both; (5) Diageo's intent in selecting its mark; (6) evidence of actual confusion; (7) the likelihood of expansion into other markets; and (8) the degree of care likely to be exercised by purchasers.  *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1290 (9th Cir. 1992).  Courts do not mechanically apply these factors and then tally the results; some factors are considered to be more important than others and each factor is not necessarily relevant in every case.  *Id.*  Accordingly, this list functions as guide and is "neither exhaustive nor exclusive."  *Id.*

1.      *First Factor*: Similarity of the Marks.

The Ninth Circuit has developed "certain detailed axioms to guide this comparison" of marks for similarity:  (i) the marks must be considered in their entirety and as they appear in the marketplace; (ii) the marks should be analyzed by their sound, sight, and meaning; and (iii) similarities are weighed more heavily than differences.  *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1206 (9th Cir. 2000) (citing *Filipino Yellow Pages, Inc. v. Asian Journal Publications, Inc.*, 198 F.3d 1143, 1147-50 (9th Cir. 1999); *Dreamwerks*, *supra*, 142 F.3d at 1131; and *Goss*, *supra*, 6 F.3d at 1392).

United States District Court
Northern District of California

1

       *a)*    <u>Sound</u>

2

       Plaintiffs argue that the word "stark"—used in Diageo's "STARK

3 RAVING™," and Plaintiffs' "STARK WINE®" and "STARK THIRST™"—is the dominant portion

4 of the trademark and is identical in sound, sight and meaning in all three marks.  Plaintiffs base this

5 argument on the PTO's rejection of the "STARK THIRST™" and "STARK NAKED" marks on the

6 grounds that those marks are similar in sound, sight, and meaning to "STARK WINE®" due to the

7 common use of the dominant word "stark."  Plaintiffs argue that because "STARK RAVING™,"

8 "STARK THIRST™" and "STARK NAKED" all begin with the word "stark" there is no difference

9 between the rejected "STARK THIRST™" and "STARK NAKED" marks, and the "STARK

10 RAVING™" mark.  Therefore, Plaintiffs argue that these similarities in sound, sight, and meaning

11 due to the common use of the dominant word "stark" are case dispositive.

12

       Plaintiffs rely too heavily on the PTO determinations regarding the STARK THIRST™ and

13 STARK NAKED applications.  The Ninth Circuit has held that a preliminary determination by a PTO

14 administrator is entitled to consideration but should not be accorded much weight where the examiner

15 did not have access to the all the evidence before the District Court.

16

> Any such determination made by the Patent Office under the circumstances just noted must be regarded as inconclusive since made at its lowest administrative level … .

17

> The determination by the Patent Office is rendered less persuasive still by the fact that the Patent Office did not have before it the great mass of evidence which the parties

18

> have since presented to both the District Court and this court in support of their claims.

19

20 *Carter-Wallace, Inc. v. Procter & Gamble Co.*, 434 F.2d 794, 802 (9th Cir. 1970).  Thus, even if the

21 PTO rejected Diageo's trademark application for the "STARK RAVING™" mark, this evidence

22 would be entitled to minimal weight.  Here, Plaintiffs did not call the PTO examiner to testify as to

23 the basis for the PTO's rejection of the "STARK THIRST™" and "STARK NAKED" marks.

24

       Nevertheless, in a vacuum while using the "sound" test, the use of the words "STARK

25 RAVING™" as compared next to "STARK THIRST™" and "STARK WINE®" in the context of

26 selling wine is likely to cause confusion.  For instance, as seen[11] on a menu or wine list, little

27

28

---

[11] One cannot fully separate sound from sight or meaning in this context.

United States District Court
Northern District of California

1  difference exists to alert the customer that the products are not related.  Thus, the sound metric

2  weighs in favor of finding similarity.

3                                              b)      *Sight*

4                          Diageo argues that aside from the commonality of the word "stark," the marks

5  have nothing in common.  Even if the dominant portion of the wines' names is "stark," this does not

6  mean that the other words in the name have no significance.  *Alpha Indus., Inc. v. Alpha Steel Tube &*

7  *Shapes, Inc.*, 616 F.2d 440, 444 (9th Cir. 1980) ("These other words are significant words, indicating

8  a different origin, not merely descriptive words.").

9          The marks must be "[c]onsidered in their entirety and as they appear in the marketplace."

10  *Goss*, *supra*, 6 F.3d at 1392; *Kern v. Mindsource, Inc.*, 225 F.3d 663 (9th Cir. 2000) (similarity must

11  be considered in light of the way the marks are encountered in the marketplace ); *First Brands Corp.*

12  *v. Fred Meyer, Inc.*, 809 F.2d 1378, 1383-84 (9th Cir. 1987) (examining the "total effect of the

13  defendant's product and package on the eye and mind of an ordinary purchaser."); *adidas Am., Inc. v.*

14  *Payless Shoesource, Inc.*, 529 F. Supp. 2d 1215, 1234-35 (D. Or. 2007) ("similarity of design is

15  determined by considering the overall impression created by the mark as a whole rather than simply

16  comparing individual features").  "The proper test for likelihood of confusion is not whether

17  consumers would be confused in a side-by-side comparison of the products, but whether confusion is

18  likely when a consumer, familiar with the one party's mark, is presented with the other party's goods

19  alone."  *E. & J. Gallo Winery v. Consorzio del Gallo Nero*, 782 F. Supp. 457, 466 (N.D. Cal. 1991)

20  (quoting *Elizabeth Taylor Cosmetics Co. v. Annick Goutal, S.A.R.L.*, 673 F. Supp. 1238, 1248

21  (S.D.N.Y. 1987)).  Here, the marketplace is not only restaurants, which may list only the name of a

22  wine on a wine list, but other consumer outlets where the consumer would see the labels of the wines

23  themselves.

24

25

26

27

28

1    Here, Defendant argues that these:



Ex. 202                 Ex. 42

look nothing like these:





*See* Def. Opp'n 1                              Ex. 43

Kersten Krall Walz disagreed and testified that they all appear to come from the same source.

1    Diageo produced examples of other wines also using the word "stark" on the wine label which

2    are not the subject of this action and questioned Ms. Krall Walz about the possibility of confusion of

3    Plaintiffs' Stark Wine® and Stark Thirst™ marks with these other wines, such as "Stark-Condé," as

4    shown below:



Ex. 218A

14    Ms. Krall Walz testified that consumers *would not* confuse Stark-Condé wines with either of the

15    Plaintiffs' wines because the Stark-Condé label used a hyphen which suggested it was derived from

16    the name of a person.

17    The Court finds that in terms of the "sight" sub-factor as it relates to the Stark Wine® and

18    Stark Raving™ marks, it is not likely that consumers would be confused.  The Stark Wine® label is a

19    sophisticated, traditional wine label, with block lettering, set against a linen background, and **only**

20    uses the word "STARK" suggesting the last name of the winemaker himself.  The Stark Raving™

21    label is not traditional.  The image of the mad scientist/inventor, with vibrant colored paint

22    splatters—blue, orange, red, or green, depending on the varietal—suggests the exact opposite of a

23    traditional, personally crafted, boutique wine affiliated with a winemaker.  It is more radical in

24    approach and does not even list the wine's vintage or vineyard, calling out the varietals in a non-

25    traditional way—Red, White, Cab (except for the Malbec).

26    The call is closer with respect to whether consumers would be confused about the source of

27    Stark Thirst™ and Stark Raving™.  The similarities between the Stark Thirst™ and Stark Raving™

28    labels are more pronounced and the differences are more subtle than between the Stark Wine® and

1    Stark Raving™ labels.  Both Stark Thirst™ and Stark Raving™ have non-traditional wine labels.

2    The Stark Thirst™ label appears to be a hand drawn picture of an old bottle with simple colors—

3    black and white, while the label for Stark Raving™ has a picture of a person, is more colorful—blue,

4    orange, red, green—and does not list vintage or vineyard.

5           This sub-factor weighs against a finding of similarity with respect to Stark Wine®, but in

6    favor of finding similarity with respect to Stark Thirst™.

7                     *c)*       __Meaning__

8                 In this context, one cannot fully separate sight or sound from meaning.  As to

9    Stark Wine®, the most prominent feature of the label is the word "STARK."  On a wine label, the use

10    of the single word "STARK," without modifying another word, suggests solely the name of the

11    winemaker.  The Court is not persuaded by Plaintiffs' argument that their use of the word "STARK"

12    on a wine label conveys a meaning of "to the fullest extent" separate and distinct from wine produced

13    by Christian Stark.  (Reply 8.)  In this context, the word "STARK" is being used as a proper noun and

14    not as an adverb or adjective, and it evokes the name of the winemaker himself, not the dictionary

15    definition of the word.

16           On the other hand, because both Stark Thirst™ and Stark Raving™ are used as adverbs,

17    confusion is more likely as "stark" in this context means "to an absolute or complete degree."

18    Merriam-Webster's Ninth New Collegiate Dictionary, p. 1150 (1988).  The image of a mad scientist

19    on the label for Stark Raving™ communicates a message that the consumer is bold, young and

20    rebellious.  A picture of an old bottle with information that 10% of profits to WaterAid on the label

21    for Stark Thirst™ suggests complete thirst, and the impetus to buy wine which contributes 10% of

22    profits to WaterAid.  While Stark Raving™ ("totally crazy," or "completely wildly insane") and

23    Stark Thirst™ (totally and completely thirsty), communicate distinct meanings, both labels

24    communicate more than just the name of a winemaker.

25           An analysis of the components of the similarity of the marks, in their entirety and as they

26    appear in the marketplace, and weighing the similarities more heavily than the differences, strongly

27    suggests a finding of no confusion between "STARK RAVING™" and "STARK WINE®," but in

28    favor of finding confusion between "STARK RAVING™" and "STARK THIRST™."

2.      *Second Factor*:  *Relatedness of the goods.*

"Related goods are generally more likely than unrelated goods to confuse the public as to the producers of the goods." *Brookfield*, *supra*, 174 F.3d at 1055.[12]  Related goods are those "'which would be reasonably thought by the buying public to come from the same source if sold under the same mark.'"  *Sleekcraft*, *supra*, 599 F.2d at 348 n. 10 (citations omitted).

"[W]ines of all types constitute a single class of goods." *E. & J. Gallo Winery*, *supra*, 782 F. Supp. at 464.  All of the goods at issue are wine; that is enough to satisfy the relatedness element. *adidas*, *supra*, 529 F. Supp. 2d at 1236 ("Here, the parties' products are essentially identical in use and function.  Both parties sell athletic and casual footwear.  Aside from arguable differences in quality, the parties' products are 'reasonably interchangeable by buyers for the same purposes,' and thus competitive.") (citing 4 McCarthy, *supra*, § 24:23).  This factor weighs in favor of confusion.

3.      *Third Factor*:  *Common marketing channels.*

This factor considers how and to whom the respective parties' goods are sold.  4 McCarthy, *supra*, § 24:51.  "Convergent marketing channels increase the likelihood of confusion." *Nutri/System*, *supra*, 809 F.2d at 606 (quoting *Sleekcraft*, *supra*, 599 F.2d at 353).  If the "general class" of purchasers of the respective products of the parties is the same, confusion is more likely. *Sleekcraft*, *supra*, 599 F.2d at 353.  In contrast, significant differences in the price of the products, or the type of stores (*i.e.*, discount or specialty) at which the respective products are sold may decrease the likelihood of confusion.  *See L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1134 (Fed. Cir. 1993).  In determining whether significant overlap exists between the general classes of purchasers exposed to the products, relevant considerations include whether the goods are sold under the same roof; the normal marketing channels are similar or parallel; the same sales methods are employed; and the products are advertised in the same places (internet, newspapers and classified telephone directories).  *Sleekcraft*, *supra*, 599 F.2d 353.

---

[12] To satisfy the relatedness factor Plaintiffs do not need to establish that the parties are direct competitors, although where the goods are directly competitive, "the degree of similarity of the marks needed to cause likely confusion is less than in the case of dissimilar goods."  4 McCarthy, *supra*, § 24:22.

United States District Court
Northern District of California

The evidence presented suggests no overlap in the parties' channels.  Mary Frances Light Dusenbury, Defendant's Senior Director of Marketing and Innovation, explained that wine is distributed through a "three-tier" system whereby producers sell their products to distributors, who in turn sell to retail accounts.  (Light Dec. ¶ 18.)  Consumers then can purchase wine "on premises" at restaurants and bars or "off premises" from mass merchandisers, grocery stores, liquor stores, and wine shops.  (*Id.*)

Stark Wine® is sold in Christian Stark's tasting room in Healdsburg located in Sonoma County, California.  Consumers can also purchase Stark Wine® over the telephone and on Stark Wine's website.  Stark Thirst™ is sold off premises at one high-end wine store in Manhattan and through the internet, and is available on premises at two locations in Brooklyn, one upscale restaurant and one wine bar.  Diageo estimates that approximately 90% of Stark Raving™ wine will be sold "off premises" through Diageo's current network of distributors, approximately 80% of whom exclusively distribute only Diageo products.  According to Diageo, this means that Stark Raving™ wines are, and will continue to be, on the shelves at large national grocery stores and mass merchandise chains (such as Safeway, Target, and Jewel-Osco) that require a large volume supply of product, which Plaintiffs could not supply.  And any on-premises sale would most likely be served at "fast casual" chain restaurants like T.G.I. Friday's.

Plaintiffs testified of *future plans* to sell their wines through channels similar to the channels through which Diageo sells its Stark Raving™ wines.  Plaintiffs' expansion plans are relevant to the seventh factor, *infra*, but are not pertinent to the analysis of whether there is any overlap in the respective marketing channels now.  Plaintiffs did not submit any evidence that the parties advertise their products in the same places.

This factor weighs against finding confusion, as it seems that there is no overlap in the parties' respective marketing channels, except, perhaps to the extent consumers in Sonoma County shop at the mass merchandise chains and boutique wine shops.

   *4. Fourth Factor:  Strength of the mark.*

The more likely a mark is to be remembered and associated in the public mind with the mark's owner, the greater the likelihood of confusion.  *Brookfield*, *supra*, 174 F.3d at 1058 (citing

1   *Kenner Parker Toys Inc. v. Rose Art Indus., Inc.*, 963 F.2d 350, 353 (Fed. Cir. 1992)).  The "strength"

2   of a trademark is evaluated both in terms of its conceptual strength and its commercial strength.  *See*

3   2 McCarthy, *supra*, § 11:83.

4                    *a)      Conceptual Strength*

5                    Marks can be conceptually classified along a spectrum of increasing inherent

6   distinctiveness, the weakest being generic and the strongest being fanciful:

7                    generic → descriptive → suggestive → arbitrary → fanciful

8   *See Brookfield*, *supra*, 174 F.3d at 1058.  A "weak trademark" is a mark that is a meaningful word in

9   common usage or is merely suggestive or descriptive of the product or service.  "A 'generic' term is

10  one that refers, or has come to be understood as referring, to the genus of which the particular product

11  or service is a species.  It cannot become a trademark under any circumstances."  *Surgicenters of*

12  *America, Inc. v. Medical Dental Surgeries, Co.*, 601 F.2d 1011, 1014 (9th Cir. 1979) (citing

13  *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9-11 (2d Cir. 1976)).   A descriptive

14  mark specifically "describes" a characteristic or ingredient of an article or service to which it refers or

15  its purpose (*e.g.*, "Park 'N Fly"), while a suggestive mark "suggests," rather than describes, an

16  ingredient, quality or characteristic (*e.g.*, Sleekcraft) and thereby moves along the spectrum to the

17  stronger category.  *See Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 59

18  F.3d 902, 910 (9th Cir. 1995).

19          A "strong trademark" is one used only in a fictitious, arbitrary, and fanciful manner.[13]  Marks

20  that are suggestive, arbitrary or fanciful "serve[ ] to identify a particular source of a product, [and] are

21  deemed inherently distinctive."  *Two Pesos*, *supra*, 505 U.S. at 768; *Kendall-Jackson Winery. Ltd. v.*

22  *E. & J. Gallo Winery*, 150 F.3d 1042, 1046 (9th Cir. 1998).  Arbitrary marks are words, symbols,

23  pictures, etc., that may be in common linguistic use but which, when used in combination with the

24  goods or services at issue, have no descriptive connotation with those goods or services.  2 McCarthy,

25  *supra*, § 11:11.  Fanciful marks are "coined" words or phrases that are either invented or selected—

26

27  _____

    [13] For example, Ivory soap is not made of ivory, and a "common" word such as "apple" can be used as an
28  arbitrary and inherently strong trademark on a product such as personal computers.  2 McCarthy, *supra*, §
    11:11.

1   *i.e.*, words that are unknown or out of common usage at the time—solely for the purpose of

2   functioning as a trademark.  *Id.* § 11:5.

3   　　　Where a particular mark falls along this spectrum is determined by the "imagination test" and

4   the "need test."  *See Earthquake Sound Corp. v. Bumper Indus.*, 352 F.3d 1210, 1221 n.4 (9th Cir.

5   2003) (citing *Miss World (UK) Ltd. v. Mrs. Am. Pageants, Inc.*, 856 F.2d 1445, 1449 (9th Cir. 1988),

6   *abrogated in part on other grounds as recognized by Eclipse Assocs. Ltd. v. Data Gen. Corp.*, 894

7   F.2d 1114, 1116 n.1 (9th Cir. 1990).  The "imagination test" considers "how much imagination a

8   consumer must use to associate a given mark with the goods or services it identifies," with greater

9   effort on the consumer's part corresponding to a stronger mark.  *Id.*  The "need test" considers

10  whether "a mark is actually needed by competitors to identify their goods or services."  *Id.*

11  　　　Typically, in analyzing the strength of a mark, the Court would evaluate the mark which had

12  priority; a more well-known senior mark suggests greater likelihood of future or "forward" confusion

13  because a junior user's mark is more likely to be associated with that established famous mark.  In

14  that case, the concern is whether the junior mark-holder is benefiting from the goodwill of the more

15  well-known senior mark-holder.

16  　　　In a reverse confusion case, as alleged here, the concern is that consumers will believe that the

17  senior mark-holder's goods are produced by the junior mark holder or that consumers will believe

18  that the senior mark-holder is trying to "palm off" its goods as those of the junior mark-holder.  For

19  that reason, the focus in a reverse confusion case is on the strength of the junior user's mark.

20  *Dreamwerks*, *supra*, 142 F.3d at 1130 n.5 (issue was whether a consumer attending a Dreamwerks-

21  sponsored science fiction convention might do so believing that it is sponsored by DreamWorks)

22  (citing *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 959 (7th Cir. 1992)).

23  Accordingly, the Court reviews the strengths of all three marks.

24  　　　　　　　i.　　　The "Stark Raving™" mark

25  　　　Conceptually, the "Stark Raving™" mark is arbitrary because the mark

26  "uses common words in a fictitious and arbitrary manner to create a distinctive mark which identifies

27  the source of the product."  *Dreamwerks*, *supra*, 142 F.3d at 1131.  It is neither suggestive of the

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1  goods–people do not ordinarily associate drinking wine with insanity–nor descriptive of the wine's

2  characteristics–people will not go stark raving mad after they drink the wine.

3      Based on the foregoing, the Court finds that the mark "Stark Raving™" is arbitrary and

4  therefore conceptually strong.

5                    ii.      The "Stark Wine®" mark

6      Diageo argues that Stark Wine®, as a personal name, is a descriptive

7  term.  Under the trademark laws, a mark that is "primarily merely a surname" is considered

8  descriptive and not protectable unless it acquires a secondary meaning. 15 U.S.C. § 1052(e)(4), (f); 2

9  McCarthy, *supra*, § 13:1 (proof of secondary meaning is required to protect a family name).  Where,

10  as here, "stark" has a non-surname meaning, the mark is not primarily a surname, and no secondary

11  meaning is required.  *See Lane Capital Management, Inc. v. Lane Capital Management, Inc.*, 192

12  F.3d 337 (2d Cir. 1999) (mark Lane Capital Management is not a personal name mark requiring

13  secondary meaning because "lane" also has a non-surname meaning, even though "Lane" was the

14  nickname and middle name of the father of the founder of plaintiff and the middle name of the son of

15  the founder).

16      Stark Wine argues that its mark is "arbitrary" because the adjective "stark" has nothing to do

17  with wine.  (*See* Reply 8 ("Stark is not only a surname, but also an adjective that appears in the

18  dictionary ….  When it comes to describing wine, 'Stark' is arbitrary and, therefore a strong mark.").)

19  The PTO initially rejected Christian Stark's trademark application for the "Stark Wine®" mark on the

20  basis that "Stark" "is primarily merely a surname."  (Barentzen Dec., Ex. D at 52 ("in support of the

21  assertion that Stark is a surname, the examining attorney points out that the applicant's surname is

22  Stark.")).  Christian Stark responded that "[t]he word 'Stark' is not primarily a surname.  In many

23  instances it is used as an adjective … such as 'a stark white room' or a 'stark contrast.'"  (Barentzen

24  Dec., Ex. D at 44.)

25      Christian Stark testified at the preliminary injunction hearing that he was reluctant to use his

26  surname for his wine but felt that the dictionary definition of the word "stark"—complete, bold, to

27  the fullest extent—adequately captured the essence of his wines.  While conceptually, stark would be

28  an arbitrary name for a wine—as one does not normally think of wine as being "bare" or "harsh," or

22

"utterly" and "completely" so—Christian Stark and S@HS have closely associated the Stark Wine[®] and Stark Thirst™ brands with Christian Stark as the winemaker throughout its history of use.  His after-the-fact attempt to distance himself from this use is belied by his own documents:

> "Krall Walz is launching her own wine brand, Stark Thirst (of course, made by Christian)" (Exh. 18)

> "Stark Wine is a reflection of our passion for family."  (Ex. 8.)

> "The name Stark Wine derives from the owners family name … The goal is for consumers to associate the wine and its quality with the name 'Stark.'"  (Ex. 23.)

> "We chose the name Stark Thirst because Christian Stark is the winemaker."  (Ex. 240.)

Thus, while "stark" can be used as an adjective or an adverb, here, the evidence demonstrates that until Krall Walz partnered with Christian Stark it had only, and intentionally, been used descriptively to identify the wine with the winemaker himself.

Based on the foregoing, the Court finds that on this record the mark "Stark Wine[®]" is, at best, descriptive and therefore relatively weak.

iii.     The "Stark Thirst[®]" mark

Plaintiffs argue that the "Stark Thirst™" mark is conceptually strong for the same reasons that the "Stark Wine[®]" mark is strong.  (*See* Reply 8 ("When it comes to describing wine, 'Stark' is arbitrary and, therefore a strong mark").)  Conceptually, the "Stark Thirst™" mark can be classified as suggestive because it "suggests" that the product is a beverage that will quench the consumer's "thirst."  Based on the foregoing, the Court finds that the mark "Stark Thirst™" is suggestive and therefore moderately strong.

b)     *Commercial Strength.*

None of the marks has acquired commercial strength.  Plaintiffs contend that Christian Stark has "strengthened his brand to acquire commercial strength based upon the favorable reviews of his wine, and its recognition as a charitable organization."  Defendant does not dispute that Christian Stark is a good winemaker, and that his wines have received numerous accolades.  However, neither Christian Stark's wines nor the "STARK WINE[®]" trademark has commercial strength.  At best, the goodwill that Christian Stark has built into his brand through favorable reviews and charity work has created recognition in Sonoma County only.

Plaintiffs' companies are struggling financially, with little to no advertising budget. Stark Wine LLC will spend approximately $1,000 out-of-pocket marketing Stark Wine® in 2012, while S@HS has not spent any money advertising Stark Thirst™.[14] Stark Thirst™ is a relatively new brand, and Stark Wine produced no wines in either 2008 or 2010—Christian Stark testified that 2008 was a bad year for grapes and that he devoted 2010 to building his tasting room. Sales outside of Christian Stark's tasting room totaled $20,000 over the past two years, $500 in 2011. *Kern v. Mindsource, Inc.*, 225 F.3d 663 (9th Cir. 2000) (evidence did not show mark was strengthened by mark holder's activities:  (1) his advertising in magazines aimed at lawyers and the purchase of a spot on a local radio show was discontinued in 1996; (2) he had used his mark less than seven years and there was at least one other federal registration for the same mark that predated his; and (3) he did not produce any financial records of his business but only estimated annual sales to be "a couple thousand dollars, maybe").

Additionally, Tony Yarborough, a private investigator with Robert & Jackson Associates, discussed the relative unavailability of Stark Thirst™ and Stark Wine®. The investigator attempted to locate the Plaintiffs' wines on the websites where Plaintiffs Krall Walz and Christian Stark stated by Declaration that Stark Wine® and Stark Thirst™ were available, but neither wine was available to purchase on any of the websites.

Also relevant to the analysis is the extent of any advertising or marketing campaign by Diageo that may result in "a saturation in the public awareness of the junior user's mark." *Glow Indus., Inc. v. Lopez*, 252 F. Supp. 2d 962, 989 (C.D. Cal. 2002). Advertising, length of time in business, and public recognition are factors taken into account when classifying the commercial strength of marks. *Sleekcraft*, *supra*, 599 F.2d at 350; *Brookfield*, *supra*, 174 F.3d at 1058 (significant advertising expenditures can transform a suggestive mark into a strong mark where that mark has achieved actual marketplace recognition). Stark Raving™ has been marketed and promoted, only recently, on Diageo's website and via the website www.starkravingwines.com, through YouTube videos, and

---

[14] Ms. Krall Walz has devoted a significant amount of uncompensated time marketing Stark Thirst™.

United States District Court
Northern District of California

through distribution of marketing materials—including pallet wraps, playing cards, iPhone covers, bottle carriers, bar mats, and menu inserts.

With respect to Stark Raving™, whether Diageo will achieve commercial strength or brand awareness remains speculative.  Ms. Krall Walz testified that given Diageo's resources it *can* promote its Stark Raving™ wine brand to create high brand awareness.  However, she was unable to quantify the cost of creating such brand awareness in a wine label given the saturation in the market.  Ms. Light testified that wines generally do not have brand awareness, with Gallo being an exception.  Moreover, Ms. Light testified that the cost to gain such brand awareness would be extraordinary, many millions of dollars.  Ms. Light explained that she does not expect the Stark Raving™ brand to gain brand awareness because it does not have a sufficiently large advertising budget.  Diageo has not placed any television or radio advertisements, and its internet advertising has been to encourage web users to visit the Diageo Chateau & Estate Wines Company website, www.diageowines.com.  Additionally, while Diageo has spent or committed more than one million dollars to market the Stark Raving™ brand, this marketing has been directed primarily towards distributors and retailers and not consumers.

     *c)*   <u>*Third party use*</u>

Finally, Diageo argues that the Stark Wine® and Stark Thirst™ marks are weak because many other wines also using the word "stark" on their label.  "Use of similar marks by third-party companies in the relevant industry weakens the mark at issue."  *M2 Software, Inc. v. Madacy Entm't*, 421 F.3d 1073, 1088 (9th Cir. 2005) (citing *Miss World*, *supra*, 856 F.2d at 1449); *Quality Semiconductor, Inc. v. QLogic Corp.*, C-93-20971 JW, 1994 WL 409483, at *2 (N.D. Cal. May 13, 1994) ("an arbitrary mark may be classified as weak where there has been extensive third party use of similar marks on similar goods") (citing *General Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 627 (8th Cir. 1987).

Diageo has provided evidence of the use of the word "stark" by a number of other winemakers (and potential infringers).  Mr. Yarborough, Diageo's private investigator, testified about the market availability of other wines that use the word "stark" on their label:  "Stark-Condé"; "Stark Wines" made by Stark Wines LLC, a Minnesota based company that has been making its Stark

United States District Court
Northern District of California

1    Wines for over a year; a dessert wine "Stark's Star"; "Starkweather Alley" Pinot Grigio; and Indian

2    Creek Vineyard's "Stark County Red."  In response, Plaintiffs contend that Stark-Condé, Stark

3    County and Starkweather Alley relate to a name or place and therefore are not relevant; Stark Wines

4    makes "fruit wine" and is therefore not a competitor; and Stark's Star describes a grape varietal.

5           After considering the relative conceptual and commercial strengths of the parties' respective

6    marks, the Court finds that this factor weighs against a finding a likelihood of consumer confusion

7    between Stark Wine® and Stark Raving™ or between Stark Thirst™ and Stark Raving™.

8           5.      *Fifth Factor:  Intent of holder of alleged infringing mark in adopting mark.*

9           If intent to deceive consumers is shown, courts will presume that the defendant will be

10   able to accomplish its deceptive purpose.  *Goss*, *supra*, 6 F.3d at 1394 (citing *Gallo*, *supra*, 967 F.2d

11   at 1293); *Network Automation*, *supra*, 638 F.3d at 1154 (defendant's intent relevant insofar as it

12   bolsters a finding that the public will be deceived by the junior mark-holder's use of the mark).  Thus,

13   when "an alleged infringer knowingly adopts a mark similar to another's, courts will presume an

14   intent to deceive the public."  *Goss*, *supra*, 6 F.3d at 1394; *Interstellar Starship Services, Ltd. v. Epix*

15   *Inc.*, 184 F.3d 1107, 1111 (9th Cir. 1999), *superseded by statute on other grounds* ("Adopting a

16   designation with knowledge of its trademark status permits a presumption of intent to deceive").

17   Generally, the intent factor will be of minimal importance because intent can be hard to prove and

18   "intent to confuse customers is not required for a finding of trademark infringement."  *Brookfield*,

19   *supra*, 174 F.3d at 1059 (citing *Dreamwerks*, *supra*, 142 at 1132 ("Absence of malice is no defense to

20   trademark infringement.")).  Further, this factor generally focuses on whether the junior holder of the

21   mark intended to "palm off" its goods as those of the senior mark-holder, thus plays a less critical

22   role in a reverse confusion case.  *Chattanoga Mfg., Inc. v. Nike, Inc.*, 140 F. Supp. 2d 917, 930 (N.D.

23   Ill. 2001), *aff'd as modified on other grounds*, 301 F.3d 789 (7th Cir. 2002)

24          Here, Diageo was aware of both the Stark Wine® trademark and the Stark Thirst™ trademark

25   application at the time it sought to register its Stark Raving™ mark.  Diane Plaut, Diageo's Director

26   and Senior Counsel of Intellectual Property, commissioned a trademark search for the word "stark"

27   which uncovered both the Stark Wine® trademark and the Stark Thirst™ application.  Ms. Plaut spent

28

a few hours reviewing the 298-page trademark search report.[15]  (*See* Ex. 29.)  Even though Diageo's legal team was aware of the Plaintiffs' trademarks, Diageo chose to file an application to register the "Stark Raving™" mark.

Plaintiffs contend that Diageo not only was aware of their trademarks, but that Diageo intended to mislead the PTO by describing its wine as "Alcoholic beverages other than beer" rather than "Wine."  As proof, Plaintiffs argue that on April 2, 2012, which was within two months of applying for the "Stark Raving™" mark, Ms. Plaut, who filed the "Stark Raving™" application, filed a trademark application for another brand of wine Diageo was launching for Rosenblum Cellars called "Butterfly Kisses™," but in that application, Diageo disclosed that the trademark was for the goods "Wine."

For purposes of this proceeding, the evidence provided at the hearing supports Ms. Plaut's testimony that her practice on behalf of Diageo was to apply for the broadest possible protection of its trademarks so that if the opportunity arises in the future it can expand its product line.  First, she testified that Diageo has expanded wines into spirits.  Second, Ms. Plaut testified that to her understanding the description "Alcoholic beverages other than beer" was an acceptable description for a wine because it includes wine.  And, third, business records showed that approximately 80% of all of the trademark applications that she had filed for wines while she has worked at Diageo had been more expansively described as "Alcoholic beverages other than beer," not "wine."

Awareness of a senior mark-holder's trademark is not dispositive of a junior mark-holder's intent or bad faith in adopting its mark.  Thus far, the Court is aware of no evidence to show that Diageo believed that its "Stark Raving™" mark would be confusingly similar to the "Stark Wine®" or "Stark Thirst™" marks when Diageo selected the "Stark Raving™" mark.  Likewise, there has been no showing that "despite acting innocently, the junior user 'was careless in not conducting proper research to avoid infringement prior to development of its trademark.'"  4 McCarthy, *supra*, §

---

[15] The standard practice at Diageo is for the legal team to render its own report after conducting the trademark search.  Diageo did not produce that report in discovery or testify about the contents of that report at the hearing, asserting that the information is protected by attorney-client privilege and the work product doctrine. The parties did not brief this issue nor is it ultimately material in this context.

1   23:10 (quoting *Mars Musical Adventures, Inc. v. Mars, Inc.*, 159 F. Supp. 2d 1146, 1152 (D. Minn.

2   2001)).

3   　　　　Balancing the competing considerations, the preponderance of the evidence does not suggest

4   that Diageo intended to deceive the public, and therefore, this factor weighs against a finding of a

5   likelihood of confusion.

6   　　　　　　　　**6.**　　<u>*Sixth Factor*</u>:　*Evidence of actual confusion.*

7   　　　　　　In the end, "consumer confusion" constitutes "the *sine qua non* of trademark

8   infringement." *Network Automation*, *supra*, 638 F.3d at 1149.  Because of the difficulty in obtaining

9   such evidence, the failure to prove instances of actual confusion is not dispositive.  *Id*. at 1151 (citing

10   *Sleekcraft*, *supra*, 599 F.2d at 352).  Consequently, like the intent factor, this factor is weighed

11   heavily only when there is evidence of past confusion or, perhaps, when the particular circumstances

12   indicate such evidence should have been available but was not provided.  *Sleekcraft*, *supra*, 599 F.2d

13   at 353.  Given that there is no evidence of actual confusion, this factor is neutral.

14   　　　　　　　　**7.**　　<u>*Seventh Factor*</u>:　*The likelihood of expansion into other markets.*

15   　　　　　　"Inasmuch as a trademark owner is afforded greater protection against competing

16   goods, a 'strong possibility' that either party may expand its business to compete directly with the

17   other will weigh in favor of a finding that the present use is infringing." *Sleekcraft*, *supra*, 599 F.2d

18   at 354 (citing Restatement of Torts § 731(b) & cmt. c).  When goods are closely related, any

19   expansion is likely to result in direct competition.  *Id.*

20   　　　　Stark Wine and S@HS claim that they plan to grow Stark Wine® and Stark Thirst™ into

21   nationwide brands.  S@HS "is aggressively seeking a wider distribution for [Stark] wine in various

22   markets throughout the U.S."  (Stark Dec. ¶ 11.)  Stark Wine LLC and S@HS also "plan to grow the

23   [Stark Thirst™] brand and sell it nationally by 2015."  Ms. Krall Walz testified about Plaintiffs' five-

24   year plan to grow Stark Thirst™ to a 20,000 case per year brand and Stark Wine® to a 3,500 case per

25   year brand.  Within two years Plaintiffs expect to be selling their wines in all of the major wine

26   markets:  New York, California, Texas, Florida and Illinois, and nationally within five years.

27   Starting as early as 2014, Plaintiffs plan to introduce additional "Stark" sub-brand extensions,

28   including Stark Wild, Stark Naked and/or Stark Raving Mad.  When cross-examined about the

United States District Court
Northern District of California

1   likelihood of these plans materializing, Ms. Krall Walz explained that Stark Wine and S@HS have

2   access to capital to implement their plans and thus far, S@HS has met every one of its growth goals.

3        By contrast, Ms. Light's testimony revealed that penetration of the wine market is incredibly

4   difficult and expensive.  Christian Stark himself is a boutique winemaker with no experience in

5   nationwide marketing or business.  He lacks any significant third-party distribution chains even for

6   his small enterprise and does not demonstrate a sophisticated knowledge of the challenges of the

7   market at issue.  On this record, the possibility remains speculative as to whether Plaintiffs can

8   expand to Diageo's current market position.  However, Diageo is fully capable of accessing Stark

9   Wine's established market in Sonoma County.  Accordingly, this factor weights in favor of no

10  finding of confusion except as to Sonoma County.

11            *8.*     *Eighth Factor:*  *The degree of care likely to be exercised by purchasers.*

12       In assessing whether there is a likelihood of confusion, courts look to the reasonably

13  prudent purchaser exercising ordinary caution.  *Sleekcraft*, 599 F.2d at 353 ("The care exercised by

14  the typical purchaser, though it might virtually eliminate mistaken purchases, does not guarantee that

15  confusion as to association or sponsorship is unlikely").  "[T]he standard of care to be exercised by

16  the reasonably prudent purchaser will be equal to that of the least sophisticated consumer."  *Ford*

17  *Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 293 (3d Cir. 1991).  Wine is considered a

18  good with which the average consumer does not exercise care when purchasing.  *E. & J. Gallo*

19  *Winery*, *supra*, 782 F. Supp. at 465 (with respect to wine drinkers, "lack of consumer sophistication

20  significantly enhances the likelihood of confusion between the two products"); *Taylor Wine Co., Inc.*

21  *v. Bully Hill Vineyards, Inc.*, 569 F.2d 731, 734 (2d Cir. 1978) ("the average American who drinks

22  wine on occasion can hardly pass for a connoisseur of wines.  He remains an easy mark for an

23  infringer.").[16]  This factor weighs in favor of finding consumer confusion.

24

25  [16] Diageo attempts to distinguish purchasers of its wine from consumers of Plaintiffs' wines to suggest that the

26  two classes of consumers are so different that no confusion can occur.  Diageo argues that due to the relative
    unavailability of Plaintiffs' wines, consumers will need to seek them out.  This niche audience is "far more

27  likely than the average consumer to have achieved the level of connoisseurship that would allow them to
    distinguish between the parties' products."  *Sutter Home Winery, Inc. v. Madrona Vineyards, L.P.*, C 05-0587

28  MHP, 2005 WL 701599, at *11 (N.D. Cal. Mar. 23, 2005).  In contrast, Diageo characterizes consumers of
    Stark Raving wine as less sophisticated wine drinkers, which Diageo believes precludes them from knowing or

United States District Court
Northern District of California

9.      *Overall Analysis of the* Sleekcraft *Factors*

"There are at least three types of proof of likelihood of confusion: (1) survey evidence; (2) evidence of actual confusion; and (3) an argument based on an inference arising from a judicial comparison of the conflicting marks themselves and the context of their use in the marketplace." *Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1404 n.14 (9th Cir. 1997). Plaintiffs did not present survey evidence or evidence of actual confusion.  This leaves a judicial comparison of the marks.

As set forth above, the Court has compared the marks using the *Sleekcraft* factors.  As to Plaintiffs' collective claims, the factors which weigh in favor of confusion focus on sound *(i.e.* the use of the word "stark"), the fact that all goods at issue are wine, and the presumption that wine purchases will not exercise due care.  By contrast, the factors weighing against confusion include the visual comparison of the product labels, the meanings and marketplace associations connected with each of the variations (Stark Wine®, Stark Thirst™, and Stark Raving™), the lack of both conceptual and commercial strength in Plaintiffs' marks, and the lack of any actual intent on Diageo's part to confuse consumers.

Based upon that collection of evidence, the Court concludes that Plaintiffs have not shown generally a "likelihood of success on the merits."

**D.      THE EQUITIES**

Under the Lanham Act, a district court has the "power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable."  15 U.S.C. § 1116. Even if "serious questions going to the merits" existed, the balance of the hardships does not tip "sharply in favor" of granting the full scope of the requested injunction.  *Brookfield*, *supra*, 174 F.3d 1046 (where there are "serious questions going to the merits," to obtain an injunction, plaintiff must show that "the balance of hardships tips sharply in his favor").  On the current record, the balance tips in Diageo's favor except as to Christian Stark and Stark Wine LLC's own market in Sonoma County.

caring about Plaintiffs' wines.  It is the care exercised by this less sophisticated consumer that the Court must consider in the likelihood of confusion analysis.

### 1.    Harm to Plaintiffs Absent an Injunction

Even where infringement has been proven, a plaintiff cannot be granted injunctive relief unless it can show irreparable injury absent an injunction.  This requires a plaintiff to "demonstrate a likelihood of irreparable injury—not just a possibility—in order to obtain preliminary relief. " *Winter*, *supra*, 555 U.S. at 21.  Irreparable injury means an injury that is imminent, and that cannot be remedied by an award of money.

Misidentification of goods poses a threat to goodwill and reputation.  A trademark holder is entitled to control the reputation and goodwill associated with its mark.  This potential loss of goodwill or loss of control over one's reputation cannot be measured precisely and "may constitute irreparable harm for purposes of preliminary injunctive relief." *SunEarth*, *supra*, 846 F. Supp. 2d at 1083 (quoting *Mortgage Elec. Registration Sys. v. Brosnan*, 2009 WL 3647125, at *8 (N.D. Cal. 2009)).

Both Christian Stark and Ms. Krall Walz testified about a subjective fear that if Diageo floods the wine market with Stark Raving™ wine, it will be impossible to undo the damage to Plaintiffs' goodwill and reputation.  Christian Stark testified that reputation is everything in the wine industry and that people will assume that he produced Diageo's Stark Raving™, which will damage his reputation.  He testified that consumers will come to expect low quality "stark" wine, which will prevent him from selling his Stark Wine® at its current price point of $28 to $44 per bottle.  The alleged difference in price and quality between the wines could be damaging to the Stark Wine® brand.  Because there is not a likelihood of confusion generally, it is unlikely that there will be such reputational harm or loss of goodwill except in Sonoma County.

Ms. Krall Walz testified that the Stark Wine® and Stark Thirst™ brands would be damaged beyond repair.  Ms. Krall Walz and Christian Stark testified that if an injunction does not issue, they will lose the opportunity to expand their businesses nationally, which they argue is a harm that cannot be quantified.  Ms. Krall Walz testified that absent an injunction, Stark Raving™ wine will be on shelves in the same stores where Plaintiffs plan to sell Stark Wine® and Stark Thirst™.

1    Plaintiffs did not present credible evidence of the reputation or goodwill associated with the

2    Stark Thirst™ mark.  S@HS has not advertised the brand, and its wine is available at only three

3    locations in New York City.

4    Plaintiffs testified that they will not be able to do their brand extensions because the Stark

5    Raving™ wines will damage the reputation of the word "stark" in connection with wine.  However,

6    neither Ms. Krall Walz nor Christian Stark own the trademark rights to these brand extensions—one

7    acquires the exclusive right to use a trademark through its *actual use in commerce*; expansion plans

8    are not use in commerce.

9    *2.   Balancing the Relative and Potential Harm to Each Party*

10    Diageo has identified concrete and particularized harm that an injunction would cause

11    to its business.  First, Diageo claims an injunction will end the Stark Raving™ brand.  Ms. Light

12    testified that retailers have reserved shelf space for Stark Raving™, which would be lost if Diageo

13    could not ship (or had to recall) cases of Stark Raving™ wine.[17]  Additionally, an injunction would

14    also harm Diageo's goodwill with these distributors and retailers who have agreed to distribute and

15    stock the wine.  Ms. Light explained that the Stark Raving™ sub-brand is Diageo's first foray into

16    this wine submarket and its success impacts Diageo ability to establish itself as serious competitor in

17    that submarket.  Diageo argues that it would be cost prohibitive to do anything other than destroy the

18    bottles if the wine cannot be sold under the Stark Raving™ label.

19    Plaintiffs argue that any hardship is of Diageo's own making.  *See Cadence Design Sys. v.*

20    *Avant! Corp.*, 125 F.3d 824, 829 (9th Cir. 1997) ("a defendant who knowingly infringes another's

21    copyright cannot complain of the harm that will befall it when properly forced to desist from its

22    infringing activities") (internal quotations omitted).  Plaintiffs also discount the potential harm to

23    Diageo.  They argue that Diageo could just re-label the bottles if enjoined.[18]  According to Plaintiffs,

24    the Stark Raving™ sub-brand was introduced to the market recently, with no goodwill in its

---

[17] Diageo has produced approximately 80,000 cases of Stark Raving wine, approximately 17,000 cases were delivered to distributors and in turn 7,000 of those cases have been delivered to retailers.  As of August 15, 2012, Stark Raving wine is on the shelves at over 1,500 stores across the United States.  Neither party proffered evidence of the cost of relabeling or recalling the bottles already shipped.

[18] The Court notes that the actual relief sought in this action includes destroying the bottles.

1  trademark, and that Diageo is a large company with a large portfolio of beverages, of which the Stark

2  Raving™ sub-brand is a small component.

3       The harm from an erroneously issued, widespread injunction far outweighs any harm should

4  such relief be erroneously denied.  By the same token, closing Sonoma County off from Diageo will

5  have little impact and will protect Plaintiffs locally.  In that county, evidence exists that Plaintiffs

6  have built a positive reputation for Stark Wine® and there consumers are more likely to be confused

7  thus bolstering Plaintiffs' claim of hardship and tipping the scales in their favor.

8              *3.      Public Interest.*

9       Before issuing an injunction a court also must ensure that the "public interest would

10 not be disserved."  *eBay v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).  Preventing consumer

11 confusion serves the public interest and there is a strong policy in favor of protecting rights to

12 trademarks.  As set forth above, the potential for confusion is local to Sonoma County.  The public

13 interest is served by an injunction in that county.

14 **IV.   CONCLUSION**

15      For the reasons set forth above, the Court will **GRANT** a preliminary injunction, limited in

16 geographic scope to Sonoma County, California, in favor of Christian Stark and Stark Wine LLC,

17 only.  Stay @ Home Sommelier, LLC's request for a preliminary injunction is **DENIED**.

18      Therefore, the Motion for Preliminary Injunction is **GRANTED AS TO SONOMA COUNTY,**

19 **CALIFORNIA**, and otherwise **DENIED**.

20      Defendant, its officers, agents, servants, employees, and attorneys are hereby **ENJOINED** and

21 **RESTRAINED** from directly or indirectly using the mark "Stark Raving" in connection with the

22 advertisement, promotion, distribution, offering for sale or selling of wine or related goods or

23 services in Sonoma County, California.

24      Issuance of this preliminary injunction is contingent upon Plaintiffs filing proof of issuance of

25 a bond in the amount of $500.00[19] by no later than **2:00 p.m.** on **November 30, 2012**.  Should

26

27 [19] Rule 65(c) of the Federal Rules of Civil Procedure requires that the party seeking an injunction must post security "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. Pro. 65(c).  Defendant seeks a

28 $5,000,000.00 bond based upon its expected harm if the Court issues a nationwide injunction.  There is no showing that Diageo will suffer more than negligible harm if enjoined from Sonoma County.  There is no

Plaintiffs fail to file proof of such undertaking by that time, this injunction shall be dissolved without further Order by the Court.

This Order Terminates Docket Number 26.

IT IS SO ORDERED.

Date: November 1, 2012

_____
YVONNE GONZALEZ ROGERS
UNITED STATES DISTRICT COURT JUDGE

United States District Court
Northern District of California

evidence that Stark Raving™ wine is being sold in Sonoma County or that Diageo will be harmed if prevented from entering that market.  The Court, in its discretion, will require Plaintiffs post $500.00 as security.

34